UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

SHARICE GREEN, individually and on behalf of her minor child T.C.,

Plaintiffs,

-against-

JOHN B. MATTINGLY, individually and as Commissioner, BENJAMIN WILLIAMS, individually and as supervisor, RUSSELL BANKS, individually and as manager, DANIELLE SALADINO, individually and as caseworker, and CITY OF NEW YORK,

Defendants.

---

MEMORANDUM AND ORDER

07-CV-1790 (ENV) (CLP)

**VITALIANO, D.J.**

Plaintiffs Sharice Green and her son, infant T.C., bring claims pursuant to 42 U.S.C. § 1983 and state law alleging that defendants the City of New York (the "City") and four employees of the City's Administration for Children's Services ("ACS") – Commissioner John Mattingly, supervisor Benjamin Williams, manager Russell Banks, and caseworker Danielle Saladino – violated their rights when T.C. was removed from Green's custody for a four-day period. Defendants now move to dismiss plaintiffs' third amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, the motion is granted in part.

## Background

### A. Procedural History

This is not the first Rule 12 motion that the Court has addressed in this case. On August 18, 2008, the Court granted defendants' motion to dismiss plaintiffs' second amended complaint, dismissing all federal claims arising out of defendants' efforts to remove T.C. from his mother's custody pursuant to the Rooker-Feldman doctrine. (Dkt. #52.) The Court also dismissed

plaintiffs' malicious prosecution claim on 12(b)(6) grounds, and declined to exercise its pendent jurisdiction over the remaining state law claims. (Id.) However, on October 21, 2009, the United States Court of Appeals for the Second Circuit vacated dismissal of the "claims related to the four-day period in which [Green's] child was removed" based on its determination that the Rooker-Feldman doctrine did not apply. Green v. Mattingly, 585 F.3d 97, 103 (2d Cir. 2009). The Circuit also vacated the dismissal of the Monell municipal liability claims because "the District Court's dismissal of [these] claims was based on the District Court's dismissal of [plaintiffs'] claims under the Rooker-Feldman doctrine." Id. Finally, in light of its reinstatement of some of the federal claims, the court vacated the declination to exercise pendent jurisdiction.[1] Id. at 104.

On remand, the parties engaged in some document (but not deposition) discovery (Dkt. #73), and briefed defendants' renewed motion to dismiss the second amended complaint. However, on the day before their opposition was to be served, plaintiffs requested leave to file a third amended complaint to conform to the pleading standard recently clarified by the Supreme Court in Aschroft v. Iqbal, 129 S. Ct. 1937 (2009). (Dkt. #74.) Although the Court initially directed plaintiffs to submit the proposed complaint as an exhibit to their opposition, upon review of the pleading and the parties' briefs, the Court determined that the more prudent and efficient course would be to permit plaintiffs to file the new pleading. (Dkt. #83.) Plaintiffs did so (Dkt. #84), and the parties briefed the current motion to dismiss.

---

[1] Plaintiffs drastically overstate the extent of the Second Circuit's decision, noting that the appeals court "may affirm on the basis of any argument supported by the record, even if it [was] not raised in the District Court," and arguing that their claims were therefore impliedly deemed plausible as a matter of law by virtue of the fact that dismissal was not affirmed. (Pl. Opp. at 15.) Similarly, plaintiffs imply that the Second Circuit's reinstatement of the Monell claims amounted to a determination that the motion to dismiss those claims was denied on its merits, "and is the law of the case." (Id. at 20.) However, plaintiffs ignore the plain text of the opinion; the Second Circuit did not address the substantive merits of these claims, and its ruling was based only on its consideration of the Rooker-Feldman doctrine. This Court is therefore free – indeed, obligated – to review these issues *de novo*.

## B. Factual Allegations

The third amended complaint asserts many of the same claims as in the second amended complaint, but amplifies the supporting allegations, which are considered true for the purposes of the current motion. In deciding the motion to dismiss, the Court may also consider documents that are referenced in the complaint, documents that plaintiffs relied on in bringing suit and that are either in their possession or that they knew of when bringing suit, and matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995); see also Sahu v. Union Carbide Corp., 548 F.3d 59, 68 (2d Cir. 2008) ("To be sure, '[e]ven where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint.'") (quoting Time Warner, 282 F.3d at 153). Here, when plaintiffs filed the third amended complaint, they possessed documents obtained via discovery, including those appended as exhibits to defendants' prior motion to dismiss, and it is clear that plaintiffs rest many allegations on their contents. For this reason, and because the Court takes judicial notice of some documents, the Court incorporates defendants' exhibits and judicial transcripts, where appropriate, into the following recitation of the allegations.[2]

Infant plaintiff T.C. was born to Green on April 29, 2005. (Compl. ¶ 3.) On July 31, 2005, Green was physically assaulted by her husband Alex Claiborne. (Id. ¶¶ 12-13.) Claiborne was arrested (id. ¶ 13), and Green cooperated in his criminal prosecution. (Id. ¶ 17.) At his arraignment, Bronx County Criminal Court issued a temporary order of protection requiring

---

2 Of course, the Court takes judicial notice of the transcripts "not for the truth of the matters asserted" in those proceedings, "but rather to establish the fact of such litigation" and confirm the contents of those hearings. Global Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 157 (2d Cir. 2006).

Claiborne to stay away from Green, with an expiration date of September 22, 2005. (Id. ¶ 19.) Claiborne was ordered to enroll in various anger management and counseling programs, all of which he eventually completed successfully. (Id. ¶ 26.) Also arising out of this incident, someone reported to the State Central Register of Child Abuse and Maltreatment (the "State Register") that Claiborne assaulted Green in the presence of T.C., prompting the City and Mattingly to open up an ACS investigation on the family.[3] (Id. ¶¶ 14-16.) According to plaintiffs, ACS was in contact with the District Attorney's office, and knew that the criminal case was docketed for September 22, 2005. (Id. ¶¶ 20, 22.)

On that date, Criminal Court extended the order of protection for a period of three years, to expire on September 22, 2008, and the criminal case against Claiborne was concluded. (Id. ¶ 23.) Although this renewed order states "original with court papers – one copy to complainant – one copy to defendant . . ." (Goldenberg Decl. Ex. B), Green claims that she never learned the outcome of the proceedings, nor was she ever provided with a copy of the order itself until several months later. (Compl. ¶24.) Plaintiffs further assert that ACS "knew or should have known" that the order was extended for three additional years. (Id. ¶ 25.) However, on October 18, 2005, Green and T.C. began living in a shelter operated under the auspices of the New York City Department of Homeless Services, and Claiborne resumed living with them with the consent of the shelter's staff. (Id. ¶¶ 28-29.) Further, plaintiffs allege that ACS staff visited the

[3] Although for purposes of the current motion the Court accepts these allegations as true as pled, there is some confusion as to the actual date of this assault. In other parts of the complaint (id. ¶¶ 14, 21-22), plaintiffs rely on ACS intake reports and investigation records which have been supplied as exhibits by defendants. These records, however, indicate that the assault took place – and an abuse report was filed – on July 6, and that no noteworthy events took place on July 31. (Declaration of Abigail Goldenberg, Dkt. # 89 ("Goldenberg Decl.") Exs. A, C.) Defendants, failing to mention the gap in the records for July 31, nonetheless accept as true plaintiffs' allegation that an assault took place on July 31, and construe the ambiguity in the record to mean that there were actually two separate assaults on Green. (Def. Br. at 4.) The Court cannot take such an inferential leap against the nonmovant. In fact, it must do exactly the opposite at the motion to dismiss stage.

shelter and was aware of Claiborne's presence, but failed to advise Green that the protective order was still in effect or that Claiborne was in violation of that order. (Id. ¶¶ 30, 32.)

The family lived peaceably for three months, until January 20, 2006, when Claiborne slapped T.C. in the face while Green was out for a brief time. (Id. ¶¶ 36-37.) Upon her return, Green notified shelter staff, who then called the police. (Id. ¶¶ 38.) Claiborne was arrested, and T.C. was brought to a local hospital, where he was released without requiring significant medical treatment. (Id. ¶ 38-39.) The shelter staff changed the locks on Green's residence, and Green cooperated with the District Attorney to help prosecute Claiborne. (Id. ¶ 39.) On the day of the incident, shelter staff reported Claiborne's actions to the State Register, including in the report notice of the use of "excessive corporal punishment" and that Claiborne "caused serious physical harm or threat of harm to child." (Id. ¶ 40; Goldenberg Decl. Ex. E.) The oral report transmission ("ORT") summarized the call as follows: "This am, as a form of punishment, Alex (father) slapped 7 mo. Old [T.C.] across the face because the baby was crying for a bottle. As a result of the slap, [T.C.] has scratches on his face. Alex has hit the child in the past as punishment. Unknown if there were any marks or bruises as a result of past incidences. The role of Sharice is unknown." (Id.)

At some point, the State Register transmitted the report to ACS, which assigned Saladino to investigate the charges in the report, and assigned Williams and Banks to supervise that investigation. (Compl. ¶ 42.) According to plaintiffs, however, "[d]efendants Saladino, Williams, and Banks conducted a defective and constitutionally-inadequate investigation." (Id. ¶ 43.) Plaintiffs now claim that defendants had improper motives in failing to live up to professional standards: they learned that ACS was aware that Claiborne had returned to the family despite the extension of the protective order, and was thus "complicit in plaintiff's husband violating a court order." (Id. ¶¶ 44-46.) Out of concern that ACS "may have been

partially responsible for any injuries" to T.C., defendants "decided to deflect responsibility away from ACS by blaming [Green] for ACS's malfeasance and for her husband's misconduct." (Id. ¶¶ 46-47.) Rather than ask Green if she was aware of the protective order, plaintiffs allege, Saladino, Banks and Williams "decided to charge plaintiff with child neglect and to remove [T.C.] from her care solely because [Green] was a domestic violence victim." (Id. ¶ 48.) The decision to remove was made without consulting ACS domestic violence specialists. (Id. ¶ 49.)

Child neglect proceedings against Claiborne and Green were in fact brought by ACS – with Saladino as named petitioner – in Family Court on January 31, 2006. (Id. ¶ 50.) The petition noted that Claiborne hit T.C. "across the face and as a result the child sustained five red scratch marks," and that he admitted doing so to a New York City police officer. The petition further stated that Green "knew or should have known of [Claiborne's] excessive corporal punishment . . . but failed to take any action to protect" T.C., and that "according to a social worker . . . Green admitted that she knew the father hit the child on the buttocks in the past." Finally, the petition described the July 2005 assault on Green and explained that Claiborne lived with the family despite the protective order. ACS urged that T.C. be removed from the home as "necessary to avoid imminent risk to the child's life or health." (Goldenberg Decl. Ex. F.)

On the same day that the petition was filed, Saladino and ACS's counsel appeared in Family Court seeking a removal and remand of the child pursuant to Family Court Act § 1027, with the Legal Aid Society appearing as law guardian for T.C. Although Green did not appear, and claims that she had no notice of the hearing (Compl. ¶ 51), ACS's counsel advised the court that Saladino had "left messages" at the shelter where Green resided. At the hearing, the court inquired how there was risk to T.C. since Claiborne was excluded from the home and incarcerated, to which ACS's counsel responded: "Well, we learned that the social worker involved with the respondent mother . . . informed the caseworker [Saladino] today, that the

mother had stated to her that she was away, that the respondent father had hit the child in the past, and that the mother did nothing to protect the child. And this child is under a year old, and she was aware that the father had been hitting the child." Saladino told the court that Green "seems able to care for the child. However, she has lied to me several times, specifically, about where she was when the father hit the child." (Goldenberg Decl. Ex. D.)

Noting the protective order, Family Court was "satisfied that there have been efforts to work with the family and that the mother appears to have not complied with the order," evidencing "severely deficient parental judgment in the home." (Id.) The court's written order found that: (1) Green was notified of the hearing and informed of defendants' intent to apply for an order of removal; (2) T.C. suffered from abuse or neglect by the parents; (3) immediate removal was necessary to avoid imminent danger to the child's life or health because Claiborne "inflicts excessive corporal punishment on the child" and Green "failed to protect the child"; (4) reasonable efforts to prevent the need for removal were made; and (5) there were no alternatives to removal to foster care because there were no suitable people for T.C. to reside with and a temporary protective order would not eliminate the risk. (Goldenberg Decl. Ex. H.) T.C. was removed from Green's care and temporarily remanded to ACS that day. (Compl. ¶ 56.)

Plaintiffs allege that at the time of removal, T.C. suffered from physical impairments and developmental delays for which he received specialized physical and psychological services, and that defendants knew these treatments were medically necessary. (Id. ¶ 57.) They allege further that during the time that T.C. was removed from Green's care, defendants denied him these treatments. (Id. ¶ 58.) Prompted by such concerns, Green filed an application pursuant to Family Court Act § 1028 for an order returning T.C., leading to a February 3, 2006 hearing at which both Green and Saladino testified. (Id. ¶ 59.) Also testifying was Dr. Naomi Lorch, who explained that she met with T.C. three times a week for physical therapy to reduce stiffness,

improve control of the head and upper body, get proper positioning of the leg, and get T.C.'s tongue thrust and open mouth into a better position while helping him eat different kinds of food. (Goldenberg Decl. Ex. K.)

That same day, Family Court ordered the immediate return of T.C. to Green, holding that "the child should be returned home because no imminent risk to the child's life or health has been demonstrated." However, the return was ordered only under the supervision of ACS and on the condition that Green enforce a temporary order of protection against Claiborne. The court found that T.C. had "extraordinary medical needs that are best met in Green's home," but that reasonable efforts had been made to eliminate the need for removal of T.C. prior to the § 1028 hearing date, since Green was already receiving preventive services and T.C. was receiving early intervention services. (Goldenberg Decl. Ex. I.)

Defendants prosecuted Green until April 6, 2007, when all charges were dismissed. Green alleges that during that period she was forced to submit to random house searches and forego time with T.C. to attend conferences and court dates. (Compl. ¶¶ 60-61.)

**Discussion**

Plaintiffs advance § 1983 claims pursuant to the First, Fourth, and Fourteenth Amendments, arguing that defendants unlawfully removed T.C. from Green's custody. Plaintiffs also bring Monell claims against the City and Mattingly for failing to adopt proper policies for removal and providing "grossly inadequate and unprofessional training and supervision to their agents and employees, including defendants Banks, Williams, and Saldino." (Id. ¶ 81.) Plaintiffs' other § 1983 claims against individual defendants and the municipality are brought pursuant to the Fourteenth Amendment for denial of T.C.'s "constitutional right to medical treatment" during the four-day removal period. (Id. ¶ 100.) Finally, plaintiffs bring pendent state claims for loss of association, unlawful imprisonment, negligence, and abuse of process.

Defendants move to dismiss the federal claims pursuant to Rule 12(b)(6), but with respect to the state claims only argue that the Court should not exercise its pendent jurisdiction.

## I. Standard of Review

Federal Rule of Civil Procedure 8(a)(2) requires a "short and plain statement of the claim showing that the pleader is entitled to relief." This rule does not compel a litigant to supply "detailed factual allegations" in support of his claims, Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964 (2007), "but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Iqbal, 129 S. Ct. at 1949. "A pleading that offers 'labels and conclusions' . . . will not do." Id. (quoting Twombly, 550 U.S. at 555); see also In re NYSE Specialists Sec. Litig., 503 F.3d 89, 95 (2d Cir. 2007). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 557).

To survive a Rule 12(b) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 570). This "plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (internal quotations omitted); see Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007) (interpreting Twombly to require a "plausibility standard" that "obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible") (emphasis omitted), rev'd on other grounds, 129 S. Ct. 1937 (2009). On a Rule 12(b)(6) motion, the Court must accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the nonmoving party. Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co., 517 F.3d 104, 115 (2d Cir. 2008).

## II. Section 1983 Claims – Removal of T.C.

"To state a valid claim under 42 U.S.C. § 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." Whalen v. Cnty. of Fulton, 126 F.3d 400, 405 (2d. Cir. 1997) (citing Eagleston v. Guido, 41 F.3d 865, 875-76 (2d Cir. 1994)). By its terms, § 1983 does not create substantive rights, but rather offers "a method for vindicating federal rights elsewhere conferred." Patterson v. Cnty. of Oneida, 375 F.3d 206, 225 (2d Cir. 2004) (quoting Baker v. McCollan, 443 U.S. 137, 144 n.3, 99 S. Ct. 2689, 2695 (1979)); see Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993).

Plaintiffs contend that ACS was aware of Claiborne's violation of the protective order but failed to institute criminal proceedings against him or advise Green that the order was extended. The Court assumes for purposes of this motion that these allegations are true. But plaintiffs go further, alleging that defendants sought to cover up their failure to protect T.C. by targeting Green with neglect proceedings. Yet, for all of the ink plaintiffs devote to the narrative of unethical, self-preserving city employees who "commenced legal proceedings because . . . Green previously had been a victim of domestic violence" (Pl. Opp. at 4), plaintiffs only allege four instances of actual *conduct* by defendants. Defendants, generally, are alleged to have conducted a "defective" and "inadequate" investigation (Compl. ¶ 43), proceeded against Green without first consulting domestic violence specialists (id. ¶ 49), and failed to notify Green of the § 1027 hearing. (Id. ¶ 51.) Additionally, Saladino is alleged to have made false statements of fact and omitted material information in her verified petition and testimony in Family Court, with the "knowledge and consent" of Williams and Banks. (Id. ¶¶ 53-54.)

### A. Individual Claims Against Williams and Banks

As an initial matter, "[i]t is well settled in this Circuit that personal involvement of

defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Shomo v. City of New York, 07-CV-1208, 2009 U.S. App. LEXIS 23076, at *17 (2d Cir. Aug. 13, 2009) (quoting Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)); see Iqbal, 129 S. Ct. at 1948 ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). Personal involvement of a supervisory official can be established by plausibly alleging that he: (1) participated directly in the alleged constitutional violation; (2) had knowledge of the violation but failed to remedy the wrong; (3) created the policy or custom under which the violation occurred; (4) was grossly negligent in supervising subordinates who caused the violations; or (5) exhibited deliberate indifference by failing to act on information indicating that constitutional deprivations were taking place.[4] Colon, 58 F.3d 865 at 873.

Here, plaintiffs have not sufficiently alleged personal involvement by Banks and Williams to support plausible § 1983 causes of action. Saladino is the alleged wrongdoer in the complaint. Plaintiffs allege that she was assigned to investigate the neglect, failed to provide Green notice of the § 1027 hearing, and made false statements to Family Court. On the other hand, the allegations against Williams and Banks never evolve past general, conclusory labels of conspiracy into the realm of specific contentions that either was engaged in a constitutional deprivation. Plaintiffs contend only that Williams and Banks were assigned to "supervise"

[4] The Supreme Court holding in Iqbal has thrown the Colon factors into some doubt. See Qasem v. Toro, 09-CV-8361, 2010 U.S. Dist. LEXIS 80455, at *9-*10 (S.D.N.Y. Aug. 10, 2010) (explaining that the "Second Circuit has not yet addressed how Iqbal affects the five [Colon] categories" but that "the degree of personal involvement required to overcome a Rule 12(b)(6) motion varies depending on the constitutional provision alleged to have been violated"); Bellamy v. Mount Vernon Hosp., 07-CV-1801, 2009 U.S. Dist. LEXIS 54141, at *27 (S.D.N.Y. June 26, 2009), aff'd, 2010 U.S. App. LEXIS 14981 (2d Cir. July 21, 2010) (finding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster"). The Court need not wander into this jurisprudential fray regarding the breadth of Iqbal's impact on the Colon factors since it determines that claims against Williams and Banks fail on *all* of them.

Saladino and in so doing, had "knowledge" of, and "consented" to, Saladino's malfeasance. The complaint provides no factual enhancement on how the investigation was shoddy, how Williams and Banks knew of any wrongdoing by the investigator, or how they actually endorsed – either implicitly or explicitly – those unconstitutional actions. In other words, the complaint only plausibly targets the supervisors on a theory of *respondeat superior* – an improper basis for § 1983 liability. See Samuels v. Selsky, 166 Fed. Appx. 552, 556 (2d Cir. 2006); Solar v. Annetts, 08-CV-5747, 2010 U.S. Dist. LEXIS 30386, at *9 (S.D.N.Y. Mar. 16, 2010). Therefore, the § 1983 claims against Williams and Banks based on the removal of T.C. from Green's custody are dismissed with prejudice.[5]

B. Fourteenth Amendment

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." Parents "'have a constitutionally protected liberty interest in the care, custody, and management of their children,' and family members have a fundamental right under the Fourteenth Amendment to stay together." Shapiro v. Kronfeld, 00-CV-6286, 2004 U.S. Dist. LEXIS 23807, at *35 (S.D.N.Y. Nov. 24, 2004) (quoting Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999)). Although this interest is "perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court," Troxel v. Granville, 530 U.S. 57, 65, 120 S. Ct. 2054, 2060 (2000), "[t]he constitutional privileges attached to the parent-child relationship . . . are hardly absolute." United States v. Myers, 426 F.3d 117, 125 (2d Cir. 2005). Rather, the interest in family integrity is "counterbalanced by the

5 Mattingly, as commissioner of ACS, is in a different position because he can make policy. Although plaintiffs have failed to demonstrate that Mattingly participated directly in alleged wrongdoing, he may be "personally involved" through the third Colon factor: creation of a policy or custom under which the alleged violations occurred. See Scott v. Fisher, 09-CV-1451, 2010 U.S. App. LEXIS 15944, at *25-*26 (2d Cir. Aug. 2, 2010). Section § 1983 claims against Mattingly are therefore discussed along with Court's analysis of plaintiffs' Monell claims, see infra Part II.E.

compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves." Wilkinson v. Russell, 182 F.3d 89, 104 (2d Cir. 1999) (internal quotation marks omitted). As a result, in addressing due process claims against ACS arising from responses to child abuse, courts "impose few concrete restrictions on case workers in exercising their discretion, short of . . . obvious extremes," id., and require only a "reasonable basis for their finding of abuse . . . consistent with some significant portion of the evidence before them." Emerson v. City of New York, 09-CV-1656, 2010 U.S. Dist. LEXIS 74318, at *13-*14 (S.D.N.Y. July 19, 2010) (internal quotation marks omitted); see also Wilkinson, 182 F.3d at 106 (noting that a "mere failure to meet local or professional standards, without more, should not generally be elevated to the status of a constitutional violation"). Indeed, this has been referred to as "unusual deference in the abuse investigation context." Id. at 104.

*1. Procedural Due Process*

"[A] parent may not lawfully be deprived of the custody of his or her child without a hearing at a meaningful time and in a meaningful manner." Villanueva v. City of New York, 08-CV-8793, 2010 U.S. Dist. LEXIS 38703, at *24 (S.D.N.Y. Apr. 14, 2010) (internal quotation marks omitted). "Procedural due process 'generally requires a hearing prior to depriving a parent of custody or a prompt post-deprivation hearing if the child is removed under emergency circumstances.'" Shapiro, 2004 U.S. Dist. LEXIS 23807, at *35-*36 (quoting Velez v. Reynolds, 325 F. Supp. 2d 293, 303 (S.D.N.Y. 2004)). Here, T.C. was removed pursuant to a court order; a formal petition was filed by ACS in Family Court pursuant to New York Family Court Act ("F.C.A.") § 1027, and a hearing took place that same day. Moreover, Green exercised her rights under F.C.A. § 1028 and moved for an immediate return of T.C. to her custody, which hearing took place four days after the initial removal. There can be no dispute

that Family Court proceedings were conducted on an expedited basis.[6]

Although plaintiffs do not distinguish between procedural and substantive due process, plaintiffs attack the propriety and application of removal procedures on a number of grounds. First, plaintiffs contend that defendants decided to remove T.C. "without first consulting with ACS's domestic violence specialists, despite defendant City's provision of child protective specialists to consult on cases involving domestic violence, as announced in Nicholson v. Scoppetta, 00 Civ. 2229 (E.D.N.Y.)." (Compl. ¶ 49.) Plaintiffs appear to be referencing Nicholson v. Williams, 203 F. Supp. 2d 153 (E.D.N.Y. 2002), which was appealed to the Second Circuit, Nicholson v. Scoppetta, 344 F.3d 154 (2d Cir. 2003), which in turn certified questions to the New York Court of Appeals, Nicholson v. Scoppetta, 3 N.Y.3d 357, 787 N.Y.S.2d 196, 820 N.E.2d 840 (2004). The primary issue in that class action suit, however, spotlighted ACS's calculus for determining danger or risk to children who merely "witnessed domestic abuse against a parent or caretaker," not where, as here, the peg for removal is the fact that the children themselves have been physically abused. Nicholson v. Scoppetta, 116 Fed. Appx. 313, 315-16 (2d Cir. 2004) (applying the clarifications provided by the New York Court of Appeals). In that case, after extensive fact-finding on ACS policy, the district court enjoined ACS from carrying

6 The F.C.A. provides for different procedures for removing a child depending on the level of urgency. If ACS has "reasonable cause to believe" that danger to a child is so imminent that there is no time to pursue a court order, then ACS may immediately remove the child. N.Y. Fam. Ct. Act § 1024(a). Jurisprudence on procedural due process claims against ACS usually addresses this type of removal, where the issue is whether participation by the judiciary was reasonably excused. See, e.g., Tenenbaum, 193 F.3d at 581; Hollenbeck v. Boivert, 330 F. Supp. 2d 324 (S.D.N.Y. 2004). Where matters are less urgent, but the danger is immediate enough that there is not time to file a formal petition with Family Court, ACS may seek a temporary order of removal under § 1022, to be heard on the day of application. Finally, where, as here, there is sufficient time to file a formal petition, ACS must so file and move for a hearing to determine if removal is necessary to avoid imminent risk to the child's life or health, to be held "no later than the next court day." N.Y. Fam. Ct. Act § 1027(a)(i). Following removal, a parent may seek a return, and "such hearing shall be held within three court days of the application." Id. § 1028(a). See generally Villanueva, 2010 U.S. Dist. LEXIS 38703, at *3-*9 (providing background and explanation of F.C.A. provisions).

out *ex parte* removals "solely because the mother is the victim of domestic violence" unless there is "imminent danger," and required that domestic violence specialists be consulted under those specific circumstances. Nicholson, 181 F. Supp. 2d at 190-92. The court did not hold – and no other case (federal or state) has held – that such consultation is required to comport with procedural due process in the circumstances alleged here. This Court certainly does not read Nicholson to extend the due process protections it prescribes to that extreme.

Second, plaintiffs contend that defendants failed to notify Green of the § 1027 hearing. Since "even the least urgent proceeding for temporary removal is still held on an extremely expedited basis . . . the F.C.A. does not require any particular form of notice when a court order of temporary removal is sought under . . . § 1027, but rather requires ACS to 'make every reasonable effort, with due regard for any necessity for immediate protective action, to inform the parent . . . of the intent to apply for the [temporary order of removal].'" Villanueva, 2010 U.S. Dist. LEXIS 38703, at *5-*6 (quoting N.Y. Fam. Ct. Act § 1023). It is questionable whether any notice at all is *constitutionally* required for §1027 hearings, see Tenenbaum, 193 F.3d at 595 n.10 (refusing to "hold, expressly or implicitly . . . that notice to parent or guardian is constitutionally required"), but that broader point is academic in this case because reasonable efforts to contact Green were made. Plaintiffs do not allege that ACS never attempted to contact her; they only claim that Saladino misled Family Court by alleging that ACS left "multiple messages" with the shelter "when in fact they left only one message, which they knew would not reach Ms. Green." (Pl. Opp. at 9.) Plaintiffs' only basis for alleging that defendants masterminded a message that would not be received is their conclusory non-sequitur that defendants "had no problem finding plaintiff when they went to remove T.C." (Id. at 14.) What is determinative is that plaintiffs concede that ACS left notice at Green's residence by phone. The Court dismisses plaintiffs' procedural due process claims on this score. See, e.g.,

Villaneuva, 2010 U.S. Dist. LEXIS 38703, at *25 (denying due process claim when plaintiff was "notified by voicemail" of § 1027 hearing).

Third, plaintiffs allege that the investigation by ACS was "defective" and "inadequate" without providing any further factual enhancement as to *how* the investigation fell short of constitutional standards. Although this allegation alone does not survive Iqbal scrutiny, plaintiffs make more specific allegations about Saladino, contending that she intentionally misrepresented plaintiffs' situation in Family Court. In essence, plaintiffs allege that the § 1027 hearing was unfairly tainted by material, perjurious statements regarding Green's fitness to care for T.C.

Perjury by an ACS caseworker to effectuate an otherwise improper removal may constitute a violation of procedural due process.[7] See Chi Chao Yuan v. Rivera, 48 F. Supp. 2d 335, 346 (S.D.N.Y. 1999) ("The right to a fair tribunal includes the right to a proceeding free of perjury by state officials"); see also E.D. v. Tuffarelli, 692 F. Supp. 2d 347, 359 (S.D.N.Y. 2010) (listing "manufacturing evidence" and "ignoring exculpatory information" as the sort of "obvious extremes" against which ACS caseworkers are not protected); cf. Morrison v. Lefevre, 592 F. Supp. 1052, 1073 (S.D.N.Y. 1984) ("The introduction of false evidence in itself violates the due process clause."). The question for the Court, then, is whether Saladino's alleged misrepresentations were sufficiently material and serious to render the removal process

---

7 To the extent that plaintiffs' claims encompass representations actually made by ACS's lawyer at the Family Court hearing, those representations cannot serve as the basis for § 1983 liability because the lawyer is entitled to absolute immunity. See Cornejo v. Bell, 592 F.3d 121, 128 (2d Cir. 2010). ACS caseworkers, on the other hand, are protected only by qualified immunity, which shields them from civil liability if "it was objectively reasonable to believe that [their] acts did not violate . . . clearly established rights" of which a reasonable person would have known. Id. (quoting Young v. Cnty. of Fulton, 160 F.3d 899, 903 (2d Cir. 1998)); see V.S. v. Muhammad, 595 F.3d 426, 431 (2d Cir. 2010). Qualified immunity may protect Saladino from claims of a defective investigation and prosecution – even if it were sufficiently pled – insofar as she was aware that: (1) Claiborne's prior assault on Green was reported to the State Register; (2) shelter staff informed the State Register that Claiborne had slapped T.C.; (3) the ORT stated that Claiborne "has hit the child in the past as punishment;" and (4) a protective order was in force (regardless whether Green was aware of it). Qualified immunity, however, would not protect Saladino against liability for intentional misrepresentations and perjury.

constitutionally defective. See Cornejo, 592 F.3d at 129; Van Emrik v. Chemung Cnty. Dep't of Soc. Servs., 911 F.2d 863, 866 (2d Cir. 1990) (caseworkers' alleged "sins of commission and omission in what they told and failed to tell" Family Court held to not "rise to the level of a constitutional violation").

Specifically, plaintiffs allege that Saladino misrepresented that: (1) Green "had lied to Saladino several times;" (2) Green "failed to take any action to protect the subject child;" (3) defendants notified Green "to come to court by leaving multiple messages with staff at the shelter;" (4) "plaintiff knew of the order of protection which excluded her husband from her home, but allowed him to live with her in violation of the order;" (5) Green "knew that her husband had (allegedly) hit her child on prior occasions;" and (6) Green had "told a social worker at the shelter" that she "knew that [T.C.]'s father had hit [T.C.] on the buttocks in the past." (Compl. ¶¶ 53-54.) To be sure, some of plaintiffs' characterizations of Saladino's statements are not accurate. For example, the transcript from the Family Court proceeding reveals that Saladino told the court that Green lied to her only "about where she was when the father hit the child," and stated that an order of protection was in force, not that Green had knowledge of it. Moreover, a misrepresentation that "multiple" messages were left with shelter staff, rather than the one message conceded by plaintiffs, is not so material that it could be a due process violation; nor would the single message have been insufficient to enable the court to enter its removal order.

Of more concern is Saladino's representation in the petition that "according to a social worker . . . Green admitted that she knew the father hit the child on the buttocks in the past," a statement which ACS's counsel discussed at the hearing to evidence Green's inability to protect

T.C.[8] If Saladino completely fabricated the alleged report by a social worker – as apparently averred by plaintiffs – and intentionally misled Family Court into believing that Green took no action when T.C. was abused, it could have unfairly influenced that court's decision to remove on the basis that Green had "failed to protect the child." In other words, such lies, if made, could have so tainted the § 1027 hearing as to render Family Court an unfair tribunal and embody a constitutional deprivation. Therefore, the Court denies the motion to dismiss with respect to the procedural due process claims asserted against Saladino.[9]

2. *Substantive Due Process*

To demonstrate a violation of substantive due process rights, plaintiffs must show that the removal of T.C. "was so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection." Anthony v. City of New York, 339 F.3d 129, 143 (2d Cir. 2003) (quoting Tenenbaum, 193 F.3d at 600). Yet, "brief removals generally do not rise to the level of a substantive due process violation, at least where the purpose of the removal is to keep the child safe during investigation and court confirmation of the basis for removal." Nicholson, 344 F.3d at 172; see Villanueva, 2010 U.S. Dist. LEXIS 38703, at *30. In this case, the four-day removal of T.C., who was actually physically assaulted

---

8 Defendants contend that Saladino should nonetheless be protected by qualified immunity because she also relied on the January 20 ORT. (Def. Br. at 12.) However, that report only stated that Claiborne "has hit the child in the past as punishment," and does not state that Green was aware of or permitted those actions. Since Green's ability to protect T.C. is of central importance to the decision to remove T.C. from her custody, at this stage, the ORT is insufficient to preclude liability.

9 Plaintiffs also allege that Saladino "concealed material facts" from Family Court, and should have informed the judge that, for example, Green "cooperated with ACS in the past," ACS knew that Claiborne had resumed living with Green, Claiborne had completed anger management programs, and defendants did not know whether Green was aware of the protective order. (Compl. ¶ 54.) However, it is not clear that *omissions* of information can rise to the level of a constitutional violation, and, even if they can, the omissions alleged here are not sufficiently relevant or egregious to constitute an actionable deprivation. See Cornejo, 592 F.3d at 129 (requiring a "much more extreme misstatement" than "fail[ing] to apprise the Family Court of exculpatory information" to find a constitutional violation)..

in his residence, pending ACS investigation of the parents, could not possibly be labeled so "shocking" or "arbitrary" as to violate substantive due process. See, e.g., Tuffarelli, 692 F. Supp. 2d at 367 (granting defendants summary judgment on substantive due process claim where two children "were removed from the plaintiffs' apartment on a Friday evening, and judicial proceedings commenced in a timely manner on the following Monday"). Substantive due process claims based on the removal of T.C. are therefore dismissed.[10]

C. Fourth Amendment

The Fourth Amendment prohibits "unreasonable searches and seizures," and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation and particularly describing . . . the persons or things to be seized." Removal of a child, even on a temporary basis, may be construed as a "seizure" under the Fourth Amendment, see Tenenbaum, 193 F.3d at 602, and therefore may give rise to a § 1983 action, albeit one only "brought on behalf of a child by a parent" and not vicariously on behalf of the parent herself. Tuffarelli, 692 F. Supp. 2d at 366. Such a claim "requires an analysis that is nearly identical to the procedural due process claim." Id.; see Shapiro, 2004 U.S. Dist. LEXIS 23807, at *48 ("The [Fourth Amendment] test is similar to the procedural due process standard.").

As outlined above, plaintiffs have set forth a plausible procedural due process claim against Saladino by alleging that she intentionally misrepresented information about Green at a judicial hearing in order to secure a Family Court order, which "is the equivalent of a warrant" for Fourth Amendment purposes. Southerland v. City of New York, 521 F. Supp. 2d 218, 230 n.25 (E.D.N.Y. 2007) (citing Tenenbaum, 193 F.3d at 602-03); see Nicholson, 344 F.3d at 176.

---

[10] Obviously, the very conduct of Saladino plaintiffs advance to establish a substantive due process violation is the crux of their procedural due process claim against her. Dismissal of the substantive due process claim in no way diminishes the Court's inquiry into the potential liability of Saladino or any other defendant on other claims.

These same allegations of perjury also support a parallel Fourth Amendment claim that the Family Court order is void for lack of legitimate probable cause, and the seizure of T.C. was both unjustified and unlawful. See Southerland, 521 F. Supp. 2d at 230 (explaining that to defeat qualified immunity for ACS caseworker on Fourth Amendment claim, "plaintiff must make a substantial preliminary showing that [he] knowingly and intentionally, or with reckless disregard for the truth, made a false statement" to Family Court "and that the allegedly false statement was necessary to the finding of probable cause") (internal quotation marks omitted). Therefore, the Fourth Amendment claim brought by Green on behalf of T.C. against Saladino survives defendants' motion. However, all other Fourth Amendment causes of action are dismissed.

D. First Amendment

Although plaintiffs reference the First Amendment in their latest pleading, they provide no allegations indicating that their freedom of speech or religion or any other First Amendment freedom was in any way violated by defendants' conduct. Any purported First Amendment-based claims are therefore dismissed.

E. Municipal Liability

Assuming *arguendo* that Saladino violated plaintiffs' due process rights, following Monell v. Dep't of Social Servs., 436 U.S. 658, 98 S. Ct. 2018 (1978), and its progeny, a municipality cannot be held liable under § 1983 simply on a theory of *respondeat superior.*[11] Pembaur v. City of Cincinnati, 475 U.S. 469, 478, 106 S. Ct. 1292, 1297 (1986). Rather, there

---

[11] If plaintiffs are unable to demonstrate a constitutional violation by *any* individual, named in the lawsuit or not, relief against the City is unavailable. See City of Los Angeles v. Heller, 475 U.S. 796, 799, 106 S. Ct. 1571, 1573 (1986); Martinez v. City of New York, 06-CV-5671, 2008 U.S. Dist. LEXIS 49203, at *12 (S.D.N.Y. June 27, 2008), aff'd, Martinez v. Muentes, 340 Fed. Appx. 700 (2d Cir. 2009) ("A municipality cannot be liable for acts by its employees which are not constitutional violations."); see also Curley v. Village of Suffern, 268 F.3d 65, 71 (2d Cir. 2001) (explaining that "where alleged injuries are not solely attributable to the actions of named individual defendants, municipal liability may still be found" in the absence of liability of individual named defendants).

must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation," City of Canton v. Harris, 489 U.S. 378, 385, 109 S. Ct. 1197, 1203 (1989), which can be demonstrated by showing: "(1) a formal policy, promulgated or adopted by the City; (2) that an official with policymaking authority took action or made a specific decision which caused the alleged violation of constitutional rights; or (3) the existence of an unlawful practice by subordinate officials was so permanent or well settled so as to constitute a 'custom or usage' and that the practice was so widespread as to imply the constructive acquiescence of policymaking officials." Bradley v. City of New York, 08-CV-1106, 2009 U.S. Dist. LEXIS 51532, at *7 (E.D.N.Y. June 18, 2009) (internal citations omitted). Further, where a Monell claim is based on a failure to properly train, supervise, or discipline employees, a defendant's failure to correct the situation must "evidence[ ] deliberate indifference" to individual rights, "rather than mere negligence or bureaucratic inaction." Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 128 (2d Cir. 2004).

Plaintiffs first allege that the unconstitutional removal of T.C. from Green's custody directly resulted from the City's inadequate training and supervision. In support of this broad contention, plaintiffs provide a litany of alleged failings by the City, including "grossly inadequate" training for: (1) "investigating child abuse and neglect cases involving mothers who are victims of domestic violence;" (2) "determining whether there exists probable cause to believe that continuing in the care of their mothers presents an imminent danger to the children's life or health . . . whose mothers are domestic violence victims;" and (3) the Nicholson legal decisions and stipulation of settlement. (Id. ¶ 81.) Yet, even if the Court assumed that the City did fail in training on these topics, plaintiffs cannot establish a direct causal link between these failings and deprivation of due process in the removal of T.C., because they fail to recognize that the current situation would not be addressed by training in those areas – T.C. himself was

abused, not just Green. Similarly, plaintiffs fault the City for failure to train and supervise employees in "consulting with the clinical consultation teams in child protective cases" and "the provision of notice and an opportunity to be heard prior to the removal of children." But here, as discussed above, plaintiffs were not denied procedural due process on these grounds, so any alleged failures to train in these areas are irrelevant. Finally, in alleging "deliberate indifference," plaintiffs only provide the vague and conclusory contention that defendants should be aware of widespread institutional problems in light of unspecified lawsuits "during the past decade" by "parents and children" for removals which have led to "millions of dollars in settlements and judgments." (Id. ¶¶ 63-64.) This falls well short of demonstrating a choice by policymakers to turn a blind eye or encourage unconstitutional conduct. See, e.g., Southerland, 521 F. Supp. 2d at 238-39 (granting summary judgment in favor of municipal defendants where plaintiff in ACS removal case made only "conclusory and speculative allegations" that "ACS has a policy of 'when in doubt, yank them [children] out'").

Plaintiffs' allegations of a formally adopted unconstitutional policy or practice fare no better. On this front, plaintiffs allege that, following a 1999 Second Circuit opinion "establishing that ACS and its employees could be liable for removing children from their parents," the City "informed ACS employees in writing that they 'should go about their normal jobs as they always have, secure in the knowledge that the City stands behind them and will back that up if necessary through legal representation and financial indemnification.'" (Compl. ¶ 68.) Although plaintiffs want to spin this statement as a conscious disregard for the law and fostering a "climate of encouraging illegal removals," they ignore the context of the statement that they have quoted. The 1999 case referred to by plaintiffs is Tenenbaum v. Williams, which addressed the distinguishable issue of when ACS may effectuate emergency, pre-hearing removals. Prompted by this decision, ACS circulated a memorandum to its staff explaining the court's holding and

pertinent F.C.A. provisions. Attaching an opinion of its counsel, ACS further explained that a caseworker must make "emergency" removal decisions without a court order "on a case by case basis" and, ideally, in consulting with their supervisors. (Goldenberg Decl. Ex. L.) The excerpt plaintiffs quote from this memorandum is not, as they allege, granting permission to flaunt case law. Rather, ACS staff were told that they would be indemnified so long as they were acting within their "scope of employment," as outlined in the informational packet designed to implement – not circumvent – the Tenenbaum decision. This cannot be reasonably construed as unlawful policy or ratification of unlawful activity. As such, plaintiffs' Monell claims against the City and Mattingly based on the removal of T.C. must fail.

## II. Section 1983 Claims – Medical Treatment

"[C]hildren in foster care [have] a substantive due process right [under the Fourteenth Amendment] to protection from harm." Tylena M. v. Heartshare Children's Servs., 390 F. Supp. 2d 296, 302 (S.D.N.Y. 2005) (quoting Marisol A. by Forbes v. Giuliani, 929 F. Supp. 662, 675 (S.D.N.Y. 1996)). In order to sustain a claim for failure to provide a child in custody with proper medical care, plaintiffs must prove "deliberate indifference to serious medical needs" on the part of each defendant. Phillips v. City of New York, 453 F. Supp. 2d 690, 722 (S.D.N.Y. 2006); Richards v. City of New York, 433 F. Supp. 2d 404, 423 (S.D.N.Y. 2006). "Deliberate indifference" encompasses an official "know[ing] of and disregard[ing] an excessive risk" to a child's "health or safety." Phillips, 453 F. Supp. 2d at 722-23 (quoting Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)).

Plaintiffs hence bring substantive due process claims against Saladino, Banks, and Williams for "failing to provide [T.C.] with necessary medical, psychological, and therapeutic treatment while he was in government custody," contending that, although they knew about T.C.'s required treatment and therapies, they did not advise the foster care agency that T.C.

needed such services and did not tell T.C.'s therapists where he was residing. (Compl. ¶¶ 101-03.) Further, plaintiffs raise Monell claims, alleging that the City and Mattingly failed to properly train and supervise its employees in areas that directly bear on defendants' actions, such as the need to inquire as to whether children need medical services while in foster care and to properly inform foster care agencies as to those needs. Plaintiffs use the language of the applicable legal standards, positing that the City and Mattingly "maintained a policy of deliberate indifference" to the sorts of medical treatment that children received in foster homes. (Compl. ¶¶ 100-06.)

Defendants argue that plaintiffs' due process claims based on medical indifference should be dismissed for two reasons. First, referencing testimony by Dr. Lorch and ACS records, they point out that since T.C. was subjected to only "at most, a three day interruption in therapy," which he received only three times a week, the deprivation of medical treatment was "not sufficiently serious to constitute a Constitutional claim." (Def. Br. at 20.) In so arguing, defendants tee up a factual dispute that is plainly not for the Court to decide at this early stage. Not only does the Court lack information as to the severity of T.C.'s condition and the danger associated with missing particular forms of therapy, but it is bound to assume the veracity of plaintiffs' plausible allegations that T.C. had, as Family Court put it in a written order, "extraordinary medical needs that are best met in Green's home." (Goldenberg Decl. Ex. I.)

Defendants' other argument is that plaintiffs fail to allege personal involvement of Saladino, Williams and Banks because the contention that they failed to inform foster care of T.C.'s requirements is contradicted by Dr. Lorch's testimony at the § 1028 hearing:

> Q: And when was the last time you saw [T.C.] for this therapy?
>
> [Dr. Lorch]: I believe it was this past Tuesday.
>
> Q: Since that time, has anyone contacted you about continuing therapy for the child?

> [Dr. Lorch]: No. I had a message on my phone Tuesday or Wednesday night that said he was taken into foster care and they let me know if he could be seen there. But he hasn't been receiving any of his physical therapy.
>
> Q: Who left you that message?
>
> [Dr. Lorch]: The person who gives out the calls from St. Mary's Hospital.
>
> Q: Within your agency?
>
> [Dr. Lorch]: Within the agency, correct.

(Goldenberg Decl. Ex. K.) As an initial matter, the import of this testimony is unclear, and it does not necessarily reflect that any of the named defendants made efforts to inform the foster care agency that T.C. required medical assistance. But even if it does, the Court cannot rely on these hearsay statements for the truth of the matter asserted when it takes judicial notice of the hearing transcript. See Global Network, 458 F.3d at 157. In other words, the factual allegation that defendants failed to notify of T.C.'s condition despite knowledge to the contrary is, at this point, plausible. As the Court does not at this stage possess sufficient information to gauge whose responsibility it was to notify of T.C.'s condition, defendants' motion to dismiss § 1983 claims against Saladino, Williams and Banks arising out of alleged inadequate medical treatment of T.C. is denied. However, as plaintiffs have once again failed to provide anything other than conclusory, general allegations in support of its policy-based claims against the City and Mattingly, the Monell claims based on inadequate medical treatment are dismissed.

## III. State Law Claims

Defendants do not challenge the merits of plaintiffs' state law claims, only arguing that the Court should refuse to exercise its supplemental jurisdiction if it dismisses the federal claims. Since the Court has not dismissed all of plaintiffs' federal causes of action, this argument is now

moot, and the Court retains its jurisdiction over plaintiffs' common law claims.[12]

## Conclusion

For the reasons analyzed above, defendants' motion to dismiss is granted in part. All of plaintiffs' § 1983 claims based on the removal of T.C. from Green's custody are dismissed with prejudice, except for: (1) Fourteenth Amendment claims against Saladino for violations of procedural due process, and (2) Fourth Amendment claims against Saladino brought by Green on behalf of T.C. Further, the Court denies the motion with respect to § 1983 claims against Saladino, Williams and Banks based on the alleged failure to notify foster care of T.C.'s medical needs. All federal claims against the City and Mattingly, however, are dismissed with prejudice.

The parties are directed to contact Magistrate Judge Pollak to arrange for a status conference, to complete any open discovery and to advise the Court within 30 days of the conclusion of outstanding discovery whether any party intends to move for summary judgment.

SO ORDERED.

Dated: Brooklyn, New York
September 22, 2010

s/ENV

ERIC N. VITALIANO
United States District Judge

[12] Leave is granted for defendants to renew their application should they move for summary judgment on the remaining federal claims.